(Hamilton County Common Pleas.)

THE STATE OF OHIO ex rel. Calvin M. Fenner, a tax-payer, on behalf of the City of Cincinnati, v. ROBERT ALLISON et al., as Members of the Board of Public Service of the City of Cincinnati.

---

Where the board of public service of the city of Cincinnati has advertised for bids for an issue of bonds, and bids are received, and the bonds are awarded to the highest bidder at a bid which is more than par, it is not within the power of said board to afterward rescind its action in making the award, notwithstanding the sucessful bidder consents thereto.

---

HOLLISTER, J.

The city was authorized, but not required, by the act of April 20, 1893, "to improve turnpikes and avenues which have become city streets, and to provide for the payment of such improvement." Pursuant to this authority the board of public service on September 12, 1900, contracted for the improvement of Spring Grove avenue. The work proceeded, and a payment to the contractor became due December 1, 1900. The act authorized the issue of bonds of the city by the board for the cost of the improvement, so far as the city, under the act, was made responsible for the cost. To provide for the interest on the bonds, and for a sinking fund for their redemption, all of the taxable property of the city was made subject to a tax.

To provide funds with which the payment of December 1st was to be made, and to meet installments thereafter to become due under the contract, the board resolved, October 2, 1900:

"That the city auditor be, and he is hereby authorized and directed to prepare, issue and sell bonds of the city of Cincinnati, in the sum of ($150,000) one hundred and fifty thousand dollars, under the provisions of an act of the general assembly of the state of Ohio,

passed April 20, 1893, entitled 'An act authorizing cities of the first grade of the first class to improve turnpikes and avenues which have become city streets, and to provide for the payment of such improvements, (O. L. vol. 90, pages 267 and 268), said $150,00 bonds to be dated December 1, 1900, and to be payable December 1, 1920, with the option of redemption December 1, 1910, or at any time thereafter, and to bear interest at the rate of three and one-half per centum (3½ per cent.) per annum, payable semi-annually, the proceeds of sale of such bonds to be placed in the city treasury, to the credit of the fund called the 'Avenue Pavement Fund,' and to be used for the purposes designated in the act authorizing such issue.''

This action was taken by virtue of section 5 of the act, which need not be set out at length here, and of section 6, which provided:

"Said board of administration (board of public service) shall receive bids for said bonds after advertising the same for sale, once per week for four consecutive weeks, on the same day of the week in some newspapers of general circulation in said city, and shall sell the same for not less than the par value thereof, with accrued interest, to the highest bidder."

Thereupon the auditor caused the following advertisement to be made:

"Sealed Proposals.

"Sealed proposals will be received at the office of the city auditor of the city of Cincinnati until 12 o'clock noon of November 26, 1900, for the purchase of three hundred bonds of the city of Cincinnati, bearing date of December 1, 1900, and payable December 1, 1920, with option of redemption December 1, 1910, for the sum of $500 each, and with interest thereon at the rate of 3½ per centum per annum, payable semi-annually at the city treasurer's office.

"Said bonds are issued in accordance with and under a resolution passed by the board of public service October 2, 1900, under the provisions of an act of the general assembly of the state of Ohio, passed April 20, 1893, entitled 'An act authorizing cities of the first grade of the first class to improve turnpikes or avenues which have become city streets, and to provide for the payment of such improvement' (O. L. vol. 90, pages 267 and 268), and will be sold for not less than par to the highest bidder.

"Bidders will be required to state the gross-amount they will pay for the bonds, the accrued intereste to date of transfer and receipt of money for same to be added to this amount; also, as a guarantee of good faith on their part, to enclose with the proposal a certified check, payable to the order of the city auditor, for 5 per cent. of the gross amount of said bonds.

"The right to reject any and all bids is reserved.

"All proposals to be in writing signed by bidder, sealed and endorsed 'bids for bonds, and addressed to the board of public serivce care of

　　　"Paul M. Millikin,
　　　　　"City Auditor."

The highest bid received was a joint bid from Messrs. Feder, Holzman & Co. and the Union Savings Bank & Trust Company of Cincinnat, both of eminent responsibility and standing, and the board accepted their bid of $157,955 and accrued interest, and awarded the bonds to them.

The trustees of the sinking fund of Cincinnati refused, however, to register the bonds for the reason set out in their resolution of December 3, 1900, which reads:

"The attention of the board having been called to the fact that the advertisement for the sale of $150,000 avenue pavement bonds calls for bonds payable at the city treasurer's office. whereas the bonds as engraved are payable at the American Exchange National Bank, New York, the following resolution was on motion adopted:

"Resolved, that no bonds be registered by this board which do not correspond in every particluar with the averment under which bids therefor were asked."

On December 11, 1900, the board of public service, because of the resolution of the sinking fund trustees, and believing that a better price could be obtained if the bonds were made payable in New York, rescinded its action in awarding the bonds, and requested the auditor to readvertise for proposals for the bonds.

On the same day the bidders advised the board that they would "take no steps to hold the city to a delivery" to them of the bonds, and that "all conditions being equal, they would be pleased to give the city another bid at the time of the re-sale of the bonds."

The bonds had been prepared from an old form of bonds issued theretofore under the same act, and were, like those bonds, made payable in New York. To prepare a new bond to correspond, with respect to place of payment, to the advertisement, which made the bonds payable at the city treasurer's office, would cost some three or four hundred dollars. The board, therefore, acting in perfect good faith, and believing that the assurance of the bidders not to hold the city to the award, relieved them of any further duty with reference to the bid which had been made, and being desirous of saving the cost of preparing a new bond, directed its auditor to readvertise for proposals, a proceeding which would not cost more than twenty or thirty dollars.

Thereupon the plaintiff, a tax-payer, brought this suit to require the board to perform a legal duty—the delivery of the bonds to the highest bidders at the price named, claiming that under the law the board has no other power.

After full argument by the learned counsel in the case, it was submitted January 9, 1900, and on the 10th the bids, under the readvertisement, having come in on that day, the court was advised that the highest bid is in fact some seven hundred dollars less than the bid upon which the award was made. The result of the effort of the board to save money by inviting new bids has been therefore an actual loss to the city. This fact, however, the court does not regard of importance except for purposes of argument.

The question is whether or not the board had the right, even with the permission of the bidder, to treat its proceedings in advertising for bids and in making the award of the bonds as a nullity, and to proceed de novo.

The case requires immediate decision, for the board should know at once what action to take on the new bids. Without therefore entering into a discussion of the many authorities submitted by counsel on both sides, or attempting in this decision to distinguish those that are apparently in conflict, the court reaches the following conclusions, which are in its judgment supported by them:

The duties of he board of public service are prescribed by law. They have no powers other than those expressly granted by the law or necessarily implied from it. If the law vests a discretion in them with reference to a particular act, their conduct may be governed by the exercise of their judgment; if they are directed by the law to do a thing they must do it. It is not for them to say that the direction is improvident or unwise, or will entail a loss on the city. These questions are for the legislature to decide, and not for them. In the performance of acts prescribed by law, their duties are administrative only, not legislative in character, nor discretionary. When the law-making power, without whose sanction they could not act at all, requires them to proceed in a particular way, their course is laid out for them. Where they are directed to sell bonds to the highest bidder it is their clear duty to make the sale to the person coming within that description.

Of course, if the terms of the bid have not been complied with, if fraud is involved in a bid, or collusion of bidders has brought about an unfair bid, or a mistake of fact presents equitable considerations, they can reject the bid, but this does not involve in any manner the exercise of their discretion. They could make no valid sale at all under such conditions. The sale they are directed to make is necessarily the result of a contract of sale binding in all respects upon the parties in the same manner as a contract between individuals. If an offer is made by one party, and accepted by the other as made, both acting in good faith, under no mistake of fact, there is a contract.

Of such character was the offer of the board and its acceptance by the bidders. When the award was made to Feder, Holzman & Company and the Union Savings Bank & Trust Company, an agreement came into existence under which each party acquired the right of enforcement against the other. The bidders could compel a delivery to them of the bonds payable at the city treasurer's office and the board, upon tendering such bonds, could have enforced their acceptance. The contract was like any contract involving similar subject matter between individuals, with this exception only: the board were not acting for themselves as individuals, but for the city; hence when the agreement was made, the city became vested with such rights as its representatives had acquired under its terms. It was within the power of the bidders to forego, if they desired, their personal, indiviual right to require the city to perform its part of the agreement, but the board had no personal interest in the matter, and could not individually waive a right which had become vested by their action in their cestui que trust.

It is true that in the advertisement the board reserves the right to reject any and all bids, but they could not reserve any right which the law did not confer on them. They had no rights except those which were actually conferred. Of course improper, informal, collusive, fraudulent bids, or bids made under a mistake of fact, could be rejected, but this right did not depend upon the reservation. It existed in the very nature of things and by the law of contracts. If this reservation warned individuals that the board, notwithstanding the direction to sell to the highest bidder, would reject all such bids, it was well enough to put it in the advertisement; but the board acquired no legal rights under it. They could not, by mere use of words, expand or enlarge the power given them by the legislature, nor could they by such act confer power upon others who might become bidders, and who are held to know the law as well as they.

The object of the law giving a tax-payer a right to bring a suit against public officers is to provide a means by which such persons may be compelled to obey the law, or be prevented from infringing the law. The basis of his suit is not any personal or individual

interest he may have in the subject matter, but is representative in its nature. He sues on behalf of the city of Cincinnati to the end that the laws under which the city is governed and its affars administered may be complied with by those whose duty it is to execute them.

The law directed the board to make a sale of these bonds to the highest bidder. The sale was effected when the bid of Feder, Holzman & Company and the Union Savings Bank & Trust Company was accepted by the board. The contract was then made. It only remained for the board to carry into performance the obligations of the contract on its part to be complied with. One step only was to be taken, and that was to deliver the bonds it had in behalf of the city contracted to deliver. This duty the bidders could have enforced, and was one the board had no warrant of law to forego as against the city. When the award was made the city became interested in the performance of the agreement the board had made for it. The interest it had was not necessarily a pecuniary one. It might have happened that the highest bid did not represent the actual value of the bonds. The question of vital importance to the city is that its officers shall comply with the law. It is this interest which the tax-payer represents, and no other. He is not concerned in the performance of the contract as such because of such pecuniary benefits as may result therefrom to the city or to himself as a payer of taxes. It may be to the city's and to his pecuniary advantage that the city be relieved of its obligations under an agreement. To protect this interest the statute provides that "in case any officer or board fails to perform any duty expressly enjoined by law or ordinance, he shall apply to a court of competent jurisdiction for a writ of mandamus to compel the performance of such duty." This the tax-payer has done, and not having any personal interest, but only representing the public, it was not necessary that he should before bringing the suit made demand upon the board to do its duty.

It does not appear that the bidders, if the bonds are tendered to them, will refuse to take them. They do not say so. It may be that they would. But whether they would or not is a matter the court does not regard as material at this time. The question is not what the bidders will or will not do, or whether now they can be compelled to accept the bonds. We are at present concerned only with the duties of the board under the law.

It is clear that they are expressly enjoined by the law to award the bonds to the highest bidder.

It is true that the statute authorizing

the improvement of Spring Grove avenue is not mandatory, but when the board has underaken to do that which it is authorized to do, then it can only proceed as the statute directs. The mandate of section 6 is imperative, and must be followed.

After the case was argued and submitted, the attention of the court was called to a point to which no reference was made in the argument. It appears that although the resolution of the board provided that the bonds were to be payable December 1, 1920, "with the option of redemption December 1, 1910, or at any time thereafter," the city auditor in the advertisement prepared by him did not follow this direction, as it appears from the advertisement that the bonds are payable December 1, 1920, "with option of redemption December 1, 1910."

The advertisement therefore differs materially from the resolution as to the time of redemption of the bonds. Of this those who were invited to bid had ample notice, for the advertisement especially refers to the resolution. The prospective bidder knew that the bonds could not be drawn in accordance with the resolution, but he might well have been a bidder in the expectation that the board would adopt the time of redemption stated in the advertisement. The board resolved one thing, but it advertised another. It had power within the limit fixed by the law to make the bonds redeemable either as it resolved they should be, or as it had advertised they would be. It doubtless could have rejected all bids because of the discrepancy between its resolution and its advertisement, but it did not do so. It chose by its resolution accepting the bid and awarding the bonds to adopt as the time for redemption the provision of its advertisement.

The bidder could not complain of this for he bid with his eyes open. The law was not infringed in any way, for the board had power under it to fix the time of redemption as is provided by the advertisement, and the bid was a sum greater than the par value of the bonds. When the bid was accepted and the award made, the terms of the contract were fixed as they were advertised. The right thereupon accrued to the bidder to enforce delivery if he desired to do so, and the right vested in the city to compel acceptance. When the city's interest accrued, the board could not waive it by any act of theirs not authorized by law. Not having such authority, it was their duty under the law to take such steps as were necessary to make effective the sale the law required them to make. The step necessary was the delivery of the bonds.

Of course such inadvertencies in the offer for sale of public bonds as are

[COPYRIGHT, 1901, BY CARL G. JAHN.]

shown in these proceedings tend to throw a cloud on the bonds, and thereby to prevent a realization of their full value; but this is not of importance when the subject of discussion is the power of a public board. If a sale is made to the highest bidder at not less than par, the law has been complied with, and it makes no difference that a higher price might have been had if greater care had been exercised in offering the bonds for sale. The board has done nothing in all of these proceedings except in rescinding the award which was not strictly within the law and its powers, and it must conform to the law in making effective its sale of the bonds to Feder, Holzman & Company, and the Union Savings Bank & Trust Company. It can only do so by delivering to them or tendering the bonds which it sold. A peremptory writ of mandamus is awarded accordingly.

Ellis G. Kinkead and H. K. Rogers, for the Relator.

Charles J. Hunt and Wade Ellis, for the Defendant.